Joseph **BALDASSANO**, Plaintiff,

v.

Donald **LARSEN** and Union Oil Company of California, Defendants.

Civ. No. 5–82–29.

United States District Court,
D. Minnesota,
Fifth Division.

Feb. 2, 1984.

James J. Schumacher, St. Paul, Minn., for plaintiff.

Robert Mathias, Mathias & Brown, Duluth, Minn., for defendant Larsen.

George G. Eck, Dorsey & Whitney, Minneapolis, Minn., for defendant Union Oil.

## ORDER

MILES W. LORD, Chief Judge.

Defendant Union Oil Company of California has petitioned this court to limit its liability for injuries resulting from collision of two small watercraft: a Union Oil pontoon and a speedboat owned by defendant Donald Larsen. By its petition, Union Oil seeks to take advantage of a nineteenth century admiralty statute designed to aid the infant American merchant marine. This court, in an order dated December 20, 1983, indicated that it was rejecting Union Oil's petition; this memorandum will set out the reasons for so doing. Basically, the court finds that this admiralty statute was never designed to cover pleasure boats such as Union Oil's pontoon and that to allow the company to take advantage of this Act would result in a gross miscarriage of justice.

## FACTS

Plaintiff Joseph Baldassano was a special employee of Union Oil at an island the company owned and operated on Rainy Lake. Baldassano lived and worked on Curtis Island, cooking for Union Oil employees and their guests.

In the early evening on July 5, 1981, Baldassano and other Union Oil employees who had finished their work went for a recreational ride on a 28-foot pontoon boat owned by Union Oil and operated by William Dunn, a Union Oil seasonal employee. The purpose of the voyage was to pull a surfboard device upon which one person could ride while others remained as passengers on the pontoon. Shortly after leaving the Union Oil dock, the pontoon was struck broadside by a 20-foot speedboat owned and operated by defendant Larsen. Baldassano was thrown from the pontoon by the collision. He was taken first to International Falls Hospital and later to the University of Minnesota Hospital in Minneapolis, where he was diagnosed as having vertebral fractures, spinal cord injuries, and a closed head injury.

Baldassano brought suit against Union Oil and Larsen, and the matter was heard by this court as an admiralty suit with an advisory jury. This court adopted the jury's recommendation that defendant Larsen was negligent in the operation of his vessel and that his negligence was a 75 percent direct cause of Baldassano's injuries. Larsen admitted at trial that he did not see the pontoon until immediatley prior to the collision although the weather was clear and visibility unrestricted. This court also adopted the jury's recommendation that defendant Union Oil was negligent in the operation of its vessel and that this negligence was a 25 percent direct cause of Baldassano's injuries. Union Oil employee Dunn was an untrained crew member, the company having failed to provide any formal boat training for island employees such as Dunn who regularly used its vessels. Dunn had seen the Larsen boat approaching for at least 300 yards and believed that a collision would ensue from the time the Larsen boat was 50 to 100 yards away. He did not signal the Larsen boat with the horn installed on the pontoon, nor did he change his course or direction until immediately before the collision.

Again concurring with the proposal of the advisory jury, this court found that Baldassano sustained damages of $280,000. Therefore, this court ordered judgment against defendant Larsen in the sum of $210,000 and against defendant Union Oil in the sum of $70,000. (Prejudgment interest also was assessed against each defendant.)

Union Oil, citing an admiralty statute allowing ship owners to limit their liability to the value of their vessels, petitioned to reduce its judgment to $7,500, the cost of its pontoon. (Defendant Larsen is not able to limit his liability to the value of his vessel—the speedboat—because, as will be explained below, the limitation statute does not apply when an owner operates the vessel *himself* in a negligent fashion. The

statute insulates only owners who either hire crews or loan their ships to others.) This court rejects Union Oil's petition on two grounds, the most important being that the limitation of liability defense was designed to protect and foster the commercial maritime industry and is not applicable to pleasure craft.

DISCUSSION

■ A limitation of liability statute was first enacted in 1851 with the express purpose of protecting the fledgling commercial shipping industry in the United States. The statute as it now reads is set out in 46 U.S.C. § 183(a):

> The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage or injury by collision, or for any act, matter or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and the freight therein pending.

Shipowners of other nations already enjoyed such protection under the laws of their lands, and it was the intent of Congress in passing this legislation to insure that American shipping no longer be at a competitive disadvantage. *See generally, The Main v. Williams,* 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894); *Norwich Co. v. Wright,* 80 U.S. (13 Wall) 104, 20 L.Ed. 585 (1871). Senator Hamlin of Maine, who introduced the legislation, explained that it was patterned after English law:

> Why not give to those who navigate the ocean as many inducements to do so as England has done? ... That is what this bill seeks to do, and it asks no more.

23 Cong.Globe 331–32, 31st Cong., 2d Sess. (Jan. 25, 1851). The Supreme Court, in its first case interpreting the legislation, noted the Act's commercial intent:

> The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the seas, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount. How many enterprises in mining, manufacturing and internal improvements would be utterly impracticable if capitalists were not encouraged to invest in them...?

*Norwich,* 80 U.S. (13 Wall) at 121.

During the last quarter of the nineteenth century, the courts developed an interpretation of the statute that, in the words of two commentators, was "astonishingly favorable" to shipowners. Gilmore & Black, *The Law of Admiralty,* 820 (2d ed. 1975). Court rulings expanded the statute "beyond belief" as shipowners "reaped an unexpected rich harvest in the benign climate of the latter part of the century when the sun shone on invested capital as it had done in no other period of our history." *Id.* The statute, which began with the aim of putting American shipowners on an equal footing, ended up giving the Americans a much greater advantage than their foreign counterparts.

And so it came to pass that pleasure craft, which were never mentioned in the act itself nor in the legislative history, nonetheless came to reap the benefits of limited liability. This sweeping expansion of the Act, incredibly, occurred with virtually no discussion.

The Supreme Court has considered at least three cases involving pleasure boats and the limitation of liability. *Coryell v. Phipps,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941), and

*Spencer Kellogg & Sons v. Hicks,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932). In all three cases, the major issue was whether the negligence occurred with the privity or knowledge of the shipowner, which would foreclose the limitation defense. No issue was raised in any of these cases as to whether pleasure craft should be an exception to the Act, and so the Court merely assumed without discussion that the limitation law did apply to these vessels. To date, then, the Supreme Court has not fully and squarely addressed this issue.

Likewise, the Court of Appeals of the Eighth Circuit has considered the issue only in passing, mentioning it in one mere footnote sentence. *Pritchett v. Kimberling Cove, Inc.,* 568 F.2d 570, 573 n. 4 (8th Cir.1977).

Those courts directly and extensively considering the problem have been uniformly troubled by the consequences of permitting pleasure boats to so markedly reduce their liability. "Contemporary thought," wrote the Fifth Circuit Court of Appeals, "finds little reason for allowing private owners of pleasure craft to take advantage of the somewhat drastic—for the injured claimants—provisions of the Limitation Act." *Gibboney v. Wright,* 517 F.2d 1054, 1057 (5th Cir.1975). Such a situation "is in conflict with our senses of justice and appropriateness," wrote the Fourth Circuit. *Richards v. Blake Builders Supply Inc.,* 528 F.2d 745, 748 (4th Cir.1975). In their treatise, Professors Gilmore and Black state that the limitation act "has become a charter of irresponsibility for a few wealthy individuals" who are granted "a general license to kill and destroy," and they predict that in time this issue will be "of no more than historical interest" because soon courts will find that pleasure boats do not qualify for the Act's protection. Gilmore & Black, at 882, 883. However, courts to date, while criticizing the Act, have concluded that it is not within their domain to break through the tide of precedents.

This court respectfully disagrees. The spirit of the Act demands so.

It is true that the limitation act itself speaks in terms of "any vessel." And, for purpose of asserting their admiralty jurisdiction, courts have endowed this term with a broad interpretation. *St. Hilaire Moye v. Henderson,* 496 F.2d 973 (8th Cir.1974). Thus, courts have found within their admiralty jurisdiction collisions between a sailboat and a motorboat, *Otto v. Alpher,* 489 F.Supp. 953 (D.Del.1980); a pleasure boat and two air mattresses, *Rowley v. Mays,* 425 F.Supp. 116 (D.Idaho 1977), and a speedboat and a cabin cruiser, *Winter v. Eon Production, Ltd.,* 433 F.Supp. 742 (E.D.La.1976).

But merely because these two pleasure boats—the pontoon and speedboat—are regarded as "vessels" for the purpose of establishing general admiralty jurisdiction does not mean that they must qualify as such for every provision under admiralty law. 7a *Moore's Federal Practice,* 2405, 2408–09; Harolds, *Limitations of Liability and Its Application to Pleasure Boats,* 37 Temp.L.Q. 423, 428 (1964). There is a good reason for including pleasure boats under admiralty jurisdiction. Admiralty jurisdiction subjects these vessels to the same rules of the road as all other vessels plying the same waters, promoting safety through uniform operating rules. *St. Hilaire Moye,* 496 F.2d at 979. By contrast, there is no valid rationale for allowing pleasure boats to qualify for admiralty's limitation defense. The history and purpose of the limitation statute make it obvious that it was never meant to apply to pleasure boats, and allowing these small craft to creep under this Act's coverage perverts justice.

As indicated above, the Supreme Court was very liberal in interpreting the Act in its early years. But by 1954, members of the Court recognized that the times had changed, and so should their enthusiasm for the legislation. Justice Black, writing for four members of a Court divided 4–4–1, wrote:

Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the

shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons. *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954).

Indeed, many of the conditions which led to the Act's passage do no longer exist. Individual and syndicate ownership of vessels has yielded to corporate ownership which, with its own form of limited liability, makes the statute's protection of less importance. Insurance coverage—including hull and cargo and liability insurance—has expanded greatly. It may well be that the greatest beneficiaries under the act today are not, as was intended, ship builders and owners, but rather insurance companies who are able to collect full premiums while limiting their liability to the value of the vessels. *See Petition of Porter,* 272 F.Supp. 282, 285 (S.D.Tex.1967).

■ It appears that the insurance industry makes no distinction between navigable and non-navigable waters in calculating rates for pleasure craft, even though the act's protection does not extend to non-navigable areas. *See* Letter of James J. Schumacher, Attorney for Joseph Baldassano, January 9, 1984; letter of Robert E. Mathias, Attorney for Donald Larsen, January 9, 1984; letter of George G. Eck, attorney for Union Oil, January 16, 1984. This court cannot help but conclude that the insurance industry charges full premiums to many vessels sailing navigable waters and then limits its actual liability payouts to a fraction of the total damage awards. This Act was not meant to so enrich the insurance industry.

One might have some sympathy for the insurance industry, however, for it would face an insurmountable task even if it wished to so differentiate its coverage. It is impossible for insurers to know where a boat will be sailing; Minnesota alone, as is well known, is graced with thousands of lakes. And if the insurer could predict with some sureness upon which waters a vessel would sail, there might be great uncertainty as to which of those waters are classified navigable and which non-navigable. Certain lakes and streams are designated navigable for one purpose and not another; many waters have not yet been classified one way or another. Faced with such unpredictable situations, insurance companies may, out of caution, charge full premiums no matter where a boat travels.[1]

The traditional interpretation of the Act yields absurd and widely diverse results depending on the mere fortuity of situs. Imagine that Dunn had steered the pontoon into non-navigable waters adjacent to Rainy Lake; unknowingly he would have exposed Union Oil to full liability. Or suppose the Union Oil pontoon had been solely responsible for the collision; no matter how irresponsible Union Oil's agent, the corporation would be largely immune from liability.

It would be grossly unfair to apply the Act to the instant case. Baldassano and his fellow passengers took off on a short recreational voyage. Their mission, if any, was to enjoy some surfboarding. How removed this is from the activities envisioned by the Act: moving huge cargoes from port to faraway port. These commercial maritime vessels for which the Act was designed are likely to be enormously expensive; even if liability is limited to their value, the owners pay a stiff penalty and the Act's inequities are lessened. By contrast, here the value of the pontoon is a mere $7,500. To limit liability in a case such as this would be as outrageous as allowing an automobile owner to limit his liability to the value of his car should he crash while out on a Sunday drive.

The court is not unmindful of the fact that this opinion is precedent-breaking.

---

1. In the present case, Union Oil does not carry outside insurance. But the fact that this particular judgment would be paid by a multi-national company which is self-insured should have little bearing on the ultimate resolution of a problem of this magnitude. The principle of law involved here is much broader than the individual case.

There will no doubt be a great deal of interest shown in this litigation by many entities standing to profit by the status quo. But this situation cries out for remedial adjudication, and this court cannot ignore the fundamental unfairness of the law as it exists.

Therefore, this court holds that the limitation act does not apply to pleasure boats, and, as a result, Union Oil may not limit its liability to the value of its pontoon.[2]

*Accident Occurred With Union Oil's "Privity and Knowledge"*

There is an additional reason for denying Union Oil's petition to limit liability; the accident occurred with the company's "privity and knowledge."

The limitation statute provides that shipowners may limit their liability only if the damages occur "without the privity or knowledge of such owner." 46 U.S.C. § 183(a). In other words, a shipowner who loans out his boat will not be able to take advantage of the limitation defense if he has reason to know either that his vessel is unseaworthy in some respect or that the person who borrowed the vessel might engage in a negligent act.[3]

 While the plaintiff bears the initial burden of proving negligence or unseaworthiness, the defendant who petitions for limitation bears the burden of proving lack of privity or knowledge. *Coryell*, 317 U.S. at 409, 63 S.Ct. at 292; *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir.1976). Union Oil has not satisfied its burden in this case.

 The privity or knowledge necessary to preclude coverage for a corporate owner such as Union Oil must be that of an officer sufficiently high in the corporate hier-

archy for his knowledge to be imputed to the corporation. *Coryell*, 317 U.S. at 410–11, 63 S.Ct. at 293, *Spencer Kellogg & Sons*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903. "Liability may not be limited under the statute where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell*, 317 U.S. at 410, 63 S.Ct. at 293.

 In the present case, the Union Oil employee operating the pontoon at the time of the accident was only a seasonal cabin boy. Obviously Dunn does not rank high enough in the corporation to satisfy the *Coryell* standard. However, another Union Oil employee on Curtis Island does meet that test. Buck Johnson was manager and supervisor of the island for Union Oil. Johnson, who was a Coast Guard auxiliary boat handling and safety instructor, directly supervised other Union Oil employees' use of island watercraft. Yet, this court determined in its findings of fact that despite Johnson's credentials, he never provided formal training to these employees, other than brief familiarization instructions. This breached the duty of the corporate owner to provide a competent crew. *See, Kemarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959).

For the above reasons, IT IS HEREBY ORDERED That defendant Union Oil's petition to limit its liability is denied.

---

2. Union Oil did use the pontoon at times to transport guests to and from Curtis Island. Although carrying passengers for hire is a traditional maritime activity, *Duluth Superior Excursions, Inc. v. Makela*, 623 F.2d 1251, 1253 (8th Cir.1980), it is doubtful that carrying guests in this manner would be regarded as a "for hire" endeavor. Even assuming, *arguendo*, that Union Oil did sometimes use the pontoon to carry passengers for hire, it is clear that at the time of

this accident the boat was merely undertaking a recreational outing. Thus, the pontoon was a pleasure boat for the purposes of this action.

3. It has been pointed out that this "privity or knowledge" exception favors shipowners who are wealthy enough to hire crews to sail their vessels, thereby insulating themselves from full liability. Gilmore & Black, at 882.