**In the Matter of the Complaint of Christopher T. TRACEY and Jay C. Miller, Owners of the Yacht Liberty in a Cause of Exoneration From or Limitation of Liability.**

**Civ. A. No. 84–879–MA.**

United States District Court,
D. Massachusetts.

April 2, 1985.

Thomas J. Muzyka, Glynn & Dempsey, Boston, Mass., for plaintiffs.

Jerome Flanagan, Nunes, Reis & Kutsaftis, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This is a petition for exoneration from or limitation of liability. The petitioners, Christopher T. Tracey and Jay C. Miller, seek to avoid or limit their liability to the claimants, Paul M. Reis, Michael J. Nunes, and Michael G. Kutsaftis, for personal injuries and property loss suffered by the claimants as a result of a collision between the parties' respective vessels. The claimants have moved for summary judgment. That motion has been opposed by the petitioners. Jurisdiction is proper pursuant to 46 U.S.C. § 185 and 28 U.S.C. § 1333. The facts are essentially undisputed.

### I.

The petitioners are co-owners of the LIBERTY, a thirty-foot Sutphen Ocean Pacer powerboat. The claimants were aboard an eighteen-foot Glastron speedboat. On September 26, 1983, the two boats collided in the navigable waters of Narragansett Bay off Rhode Island. At the time of the collision, neither co-owner was aboard the LIBERTY. Peter McCarthy, the person who usually operates the LIBERTY, was serving as the co-owners' designated operator at the time of the incident. As a result of this collision, both vessels were damaged and personal injuries may have been sustained by individuals aboard both vessels. To date, three written claims have been filed by the claimants against the petitioners for personal injury, loss, or damage resulting from the incident.

The petitioners seek to limit their liability to the claimants under authority of the limitation of liability statutes including, among others, 46 U.S.C. §§ 183–186 as amended (the Limitation Act). These statutes insulate a shipowner who either hires a crew or loans his ship to another from liability in excess of the value of his vessel after the incident. The claimants state that the petitioners' complaint is not a proper matter for a limitation action because neither boat involved in the collision was a commercial vessel. They claim that the statute applies only to commercial vessels. In contrast, the petitioners contend that subsequent amendments to the original Limitation Act demonstrate that Congress intended to include non-commercial vessels within the scope of protection of the Act.

### II.

The applicable standard for analyzing a motion for summary judgment is clear. The record must be viewed in the light most favorable to the non-moving party. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Further, all inferences must be drawn in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Stephanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 938 (1st Cir.1983). Nonetheless, it is the function of summary judgment to " 'pierce formal allegations of facts in the pleadings ...' and to determine whether

further exploration of the facts is necessary." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), *quoting Schreffler v. Bowles,* 153 F.2d 1, 3 (10th Cir.1946).

In a short section of the petitioners' brief, the petitioners claim that there is a genuine issue of material fact as to whether their boat was a "commercial" or "pleasure" vessel. The basis of this claim, the petitioners contend, is that "[i]t may be possible ... to impute a 'commercial' use" to the vessel. (Petitioners' Opposition to Claimants' Motion p. 2). However, "an adverse party may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e). Here, the petitioners have produced no evidence contradicting the facts in the record which show that the LIBERTY was used for pleasure purposes. Nor have they provided specific facts which demonstrate that the LIBERTY was used as a commercial vessel. In fact, there is no indication that either vessel involved was ever used for anything but pleasure purposes.

Even if the non-moving party has failed to offer responsive affidavits or other materials, the burden remains on the moving party to clearly establish the lack of any triable issues of fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The claimants have met this burden. As the claimants' brief demonstrates, the petitioners acquired the boat for pleasure purposes only, (Miller Depo. p. 9), and their motive for purchasing the boat was only to enjoy it. (Miller Depo. p. 15). Funds from the petitioners' corporation were not used to purchase, maintain, or finance the boat. (Tracey Depo. p. 8). Miller and Tracey owned the LIBERTY as joint tenants. (Miller Depo. p. 8). Tracey testified that neither customers nor prospective customers of their business were taken out on the boat for business purposes. (Tracey Depo. p. 12).

Even viewing all the evidence in the light most favorable to the petitioners, there is no genuine factual dispute as to the pleasure use of the LIBERTY. The only issue remaining, then, is whether claimants are entitled to judgment as a matter of law.

### III.

The only legal question before this Court is whether the Limitation Act of 1851, as amended, applies to pleasure craft. At first glance, the language of the statute might appear to apply to such vessels. However, the language is far from conclusive on this issue. In the discussion below, I turn first to the purpose of the 1851 Act and examine both the Supreme Court's interpretation of it and the Congressional intent underlying it. Second, I discuss the extension of the Act to pleasure boats. Since the Supreme Court has not ruled squarely on this issue and the First Circuit has not interpreted the Act's applicability to pleasure boats, I then seek further guidance from decisions in other districts. Finally, I discuss the soundness of an interpretation of the Act that would limit the liability of pleasure boat owners.

### 1. *Purpose of the 1851 Act*

The original limitation of liability statute was enacted in 1851, when the first great American merchant marine was on the rise and long before pleasure powerboats were even on the horizon. The heart of this Act, presently set forth in 46 U.S.C. § 183(a), allows the owner of a vessel to limit his liability to the value of his vessel after an accident, provided the damage or injury with respect to which limitation is sought did not occur with the "privity or knowledge" of the owner:

> The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage or injury by collision, or for any act, matter or

thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 U.S.C. § 183(a).

In its initial encounter with the Act, the Supreme Court reasoned that the Act's purpose was to encourage shipbuilding and place the American merchant marine on an equal footing with that of England and the other maritime nations of Europe, where shipowners had benefited from various systems of limitation for many years. *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 121, 20 L.Ed. 585 (1781). Limited liability was essential due to the high risk involved in worldwide commercial shipping at that time. *Id.* The investor who supported a shipping venture had no control over the conduct of his ship once it left port. Given the primitive vessels and the hazards of the sea, the potential common law liabilities of the shipowner as principal made the shipping industry an unattractive investment. Greater liability would result in greater cost. Leaving the United States shipowner without protection would put him at a competitive disadvantage in the world shipping market. *See generally Hartford Accident & Indemnity Co. v. Southern Pacific Co.*, 273 U.S. 207, 214, 47 S.Ct. 357, 358, 71 L.Ed. 612 (1927); *The Main v. Williams*, 152 U.S. 122, 128, 14 S.Ct. 486, 487, 38 L.Ed. 381 (1894); Comment, *Pleasure Boat Owner Tort Liability In Admiralty: An Examination Of The Limited Liability Act And A Proposal For Reform*, 50 So. Cal.L.Q. 549, 572–74 (1977).

The Supreme Court's "commercial" interpretation is clearly supported by the Congressional history of the Act. The Senators who considered adoption of the Act viewed the English as the primary competition for American shippers. Senator Hamlin of Maine, the bill's sponsor, remarked that the Act "places our commercial marine upon the same basis as that of England." 25 Cong.Globe 713, 31st Cong., 2d Sess.

(1851). Senator Davis of Massachusetts added, "We are carriers side by side with that nation, in competition with them, and we cannot afford very well to give them any great advantage over us...." *Id.* at 714. Senator Cass summed up his view of this debate with the rhetorical question, "[H]ow are we to continue our commercial interest on a firm foundation unless we put our shipowners on the same footing with those of other countries? Is there a more important matter than one like this, in which the interest of our whole commercial marine is at stake?" *Id.*

### 2. *Judicial Extension of the 1851 Act to Pleasure Boats*

With this judicial and Congressional background, in one of the first cases that considered the application of the Limitation Act, a Michigan district court was unwilling to extend the Act's coverage to a pleasure boat "not engaged in what is ordinarily understood as maritime commerce." *The Mamie*, 5 F. 813 (E.D.Mich.), *aff'd*, 8 F. 367 (C.C.E.D.Mich.1881). However, in 1886, only five years after *The Mamie*, Congress amended the Limitation Act so as to extend its application to "all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal-boats, barges and lighters." Act of June 19, 1886, ch. 421, § 4, 24 Stat. 80 (current version at 46 U.S.C. § 188 (1982)). Although there is agreement today that the precise intent of Congress in enacting the 1886 amendment is obscure, *see* Stolz, *Pleasure Boating and Admiralty: Erie at Sea*, 51 Cal.L.Rev. 661, 708 n. 197 (1963), the United States District Court for the Southern District of New York upheld the "right of the owner of a pleasure yacht to take advantage of the statute." *In re Foss (The Luvinia)*, 1927 AMC 327, 328 (S.D.N.Y.1927). Virtually every other lower court has agreed with this holding.

On two occasions, the Supreme Court has had the opportunity to discuss limitation of liability issues in the context of cases involving pleasure boats. *See Coryell v. Phipps (The Seminole)*, 317 U.S. 406, 63

S.Ct. 291, 87 L.Ed. 363 (1943); *Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941). While the major issue to be decided in both cases was whether there was privity or knowledge on the part of the vessel owner sufficient to defeat limitation, the majority opinions conspicuously fail to discuss whether pleasure boats fell within the statute's reach. Arguably, the Court could have "merely assumed" that the limitation law applied to pleasure craft since no issue was raised as to the Act's applicability to such vessels. *Baldassano v. Larsen*, 580 F.Supp. 415, 417–18 (D.Minn.1984). Likewise, the Court may have believed that the vessel at issue was not a pleasure craft at all.[1] I will not impute "total acceptance of the propriety of applying limitation to pleasure craft" to the Supreme Court, as the petitioners suggest (Petitioners' Opposition to Claimants' Motion p. 5), where the Court has not squarely addressed the issue.

The First Circuit has not ruled on the Limitation Act's applicability to pleasure boats and therefore there is no binding precedent for this Court on this precise issue. The many courts in other districts that have felt constrained to permit pleasure boat owners to limit their liability have been disturbed by the consequences of such an interpretation of the Act. For example, the Fifth Circuit Court of Appeals wrote, "Contemporary thought finds little reason for allowing private owners of pleasure craft to take advantage of the somewhat drastic—for the injured claimants—provisions of the Limitation Act." *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir.1975). Similarly, the Fourth Circuit pointed out that limiting the pleasure boat owner's liability "is in conflict with our sense of justice and appropriateness." *Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745, 748 (4th Cir.1975).

Recently, the United States District Court for the District of Minnesota spoke directly to the inequities of existing precedent and held that the limitation of liability statute should not apply to a collision between two pleasure boats. *Baldassano*, 580 F.Supp. at 416. In *Baldassano*, a pontoon boat collided with a speedboat and the owner of the pontoon boat sought to limit his liability. The court ruled that there was "no valid rationale for allowing pleasure boats to qualify for the admiralty's limitation defense. The history and purpose of the limitation statute makes it obvious that it was never meant to apply to pleasure boats, and allowing these small craft to creep under this Act's coverage perverts justice." *Id.* at 418.

Accordingly, I agree with the analysis and the reasoning set out in *Baldassano* and I decline to adopt the alternative interpretation which I believe is contrary to common sense, fundamental fairness, and the spirit of the Act.

### 3. *A Better Rule: No Pleasure Boat Limited Liability*

It is clear that the legislative intent of the original 1851 Act was to place the American merchant marine in a competitive position with the old maritime nations of Europe. In addition, section 7 of the 1851 Act expressly provided that it should not apply to "any canal boat, barge or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation." Act of March 3, 1851, ch. 43, § 7, 9 Stat. 636 (current version at 46 U.S.C. § 188 (1982) ). In light of the Act's commercial intent, and since canal boats, barges and lighters are used in connection with cargo-carrying activities, a reasonable conclusion would be that only commercial vessels on ocean voyages were covered by the 1851 Act and those commercial vessels engaged in more local business were not.

In 1886, the language of the Act was expanded to apply to "all sea-going vessels, and also to all vessels used on lakes or rivers or inland navigation, including canal boats, barges and lighters." Act of June 19, 1886, ch. 421, § 4, 24 Stat. 80 (current

---

**1.** For example, the lower court opinion in *Coryell v. Phipps* indicates that the "pleasure yacht" at issue was purchased by the owners for use as a charter vessel. *Coryell v. Pilkington*, 39 F.Supp. 142, 143 (S.D.Fla.1941).

version at 46 U.S.C. § 188 (1982)). One might reasonably have concluded that, due to this change, the Act now covered all commercial vessels; even those engaged in local activities. Yet, this language was interpreted to apply limitation of liability to pleasure boats. *E.g., In re Porter,* 272 F.Supp. 282, 285 (S.D.Tex.1957), *citing The Francesca,* 19 F.Supp. 829, 832 (W.D.N.Y. 1937). This was so even though the 1886 Amendment did not mention non-commercial boats and the statute continued to provide that an owner could limit his liability to his interest in the vessel "and her freight then pending." Act of March 3, 1851, ch. 43, § 3, 9 Stat. 635 (current version at 46 U.S.C. § 183(a) (1982)).

■ It is clear that pleasure boats are regarded as "vessels" for the purpose of asserting admiralty jurisdiction. *See, e.g., St. Hilaire Moye v. Henderson,* 496 F.2d 973, 979 (8th Cir.1974). However, a word used in one statute does not necessarily have the same meaning in another statute. For example, in *In re United States Air Force Texas Tower No. 4,* the court wrote:

> The fact that a tower may be regarded as a vessel under the Jones Act does not necessarily make it a vessel under the limitation statute. The Jones Act has been liberally interpreted regarding the definition of a vessel.

203 F.Supp. 215, 222 (S.D.N.Y.1962). "[M]erely because these two pleasure boats ... are regarded as 'vessels' for the purpose of establishing general admiralty jurisdiction does not mean that they must qualify as such for every provision under admiralty law." *Baldassano,* 580 F.Supp. at 418.

The courts that accept the limitation argument also cite a 1936 Amendment to the Act as justification for continuing the precedent of applying the Act to pleasure boats. *E.g., In re Klarman,* 295 F.Supp. 1021, 1022 (D.Conn.1968); *In re Porter,* 272 F.Supp. at 285–86. In 1935, Congress adopted an amendment which required that, in claims based on loss of life and bodily injury, a minimum limitation fund of $60.00 per ton was to be made available for payment of such claims arising out of the operation of any "sea-going vessel." Act of August 29, 1935, ch. 804, § 1, 49 Stat. 960 (amending 46 U.S.C. § 183 (1934)) (current version at 46 U.S.C. § 183(f) (1982)). Because Congress specifically excluded pleasure craft from this amendment, these courts inferred that Congress intended to include pleasure boats in the core of the Act, § 183(a). But, again, nothing in the congressional record requires this judicial conclusion. The courts could have excluded pleasure craft from the entire Act and still remained true to the congressional intent.

■ Applying the Act to pleasure boats results in inadequate compensation to victims of pleasure boat accidents and creates needless inefficiencies and inequities in pleasure boat accident litigation. A primary goal of tort law is to compensate the victims of accidents fairly and adequately. *See* W. Prosser, Handbook of the Law of Torts § 1, at 6 (4th ed. 1971). However, the pleasure boat owner who is successful in limitation may undercompensate a victim with a meritorious claim. Such unjust results become particularly shocking where the post-accident value of the pleasure boat, and thus the liability limitation of the owner, is low and the harm to the innocent victim is high, as in the case of loss of life. This situation is so obviously unjust that Professors Gilmore and Black, in their treatise on admiralty law, have written:

> No theory can justify the results reached ... under which the owner of yacht or speedboat, who is provident enough to hire someone else to run the boat for him, is granted a general license to kill and destroy.

Gilmore & Black, The Law of Admiralty, 822 (2d ed. 1975).

Of course, where the owner is successful in limiting his liability, a claimant can still proceed against the primary tortfeasor. This primary tortfeasor, however, may not have sufficient assets to satisfy the judgment. In addition, a claimant must sue the primary tortfeasor in a separate proceeding. *See Rautbord v. Ehmann,* 197 F.2d

323, 325–26 (7th Cir.1952). He must first answer the owner's limitation petition or forego all claims against him. Where the owner is successful in limitation, the claimant must then sue the primary tortfeasor for adequate compensation. As a result, the claimant may have to bear the cost of two lawsuits. The effect of this is to create extra expense for both the claimant and the judicial system by requiring duplicate litigation even though the primary tortfeasor's negligence was thoroughly litigated in the first proceeding.

Moreover, it is not clear that the original rationale for the Act obtains today, even for commercial shippers. As the *Baldassano* Court pointed out:

> Individual and syndicate ownership of vessels has yielded to corporate ownership which, with its own form of limited liability, makes the statute's protection of less importance. Insurance coverage—including hull and cargo and liability insurance—has expanded greatly. It may well be that the greatest beneficiaries under the act today are not, as was intended, ship builders and owners, but rather insurance companies who are able to collect full premiums while limiting their liability to the value of the vessels.

580 F.Supp. at 419. Even if the "encourage investment" rationale still has some merit with respect to commercial shipowners, the rationale has no sensible application to the pleasure craft situation. In contrast to commercial shipping, pleasure boat owners in America operate within an intranational economic market, free of foreign competition. Pleasure craft owners, excluded from the Act, will not find themselves at a competitive disadvantage with respect to the cost of participating in their chosen activity. Thus, there is no rational basis for application of the Act to pleasure boats. The historical extension of the Limitation Act to such boats by the courts occurred without Congressional approval and is unnecessary and unjust.

IV.

 For the reasons set forth above, the claimants are entitled to summary judgment. I conclude that the Limitation Act does not apply to pleasure boats and, therefore, the petition to limit liability is dismissed.

SO ORDERED.