**In the Matter of William N. LOWING, As Owner of the Motorvessel OUTDOORS-MEN for Exoneration from or Limitation of Liability.**

**No. G85–1183 CA1.**

United States District Court,
W.D. Michigan, S.D.

March 31, 1986.

LeRoy Kramer, III, Grand Rapids, Mich., for petitioner.

Bruce G. Hudson, Thomas J. Mulder, Grand Rapids, Mich., for respondent.

OPINION

MILES, Chief Judge.

This case involves the application of an admiralty statute, the Limitation of Liability Act, 46 U.S.C.A. § 183 *et seq.*, to an accident involving two pleasure boats. The core portion of the Act is section 183(a) which reads as follows:

> The liability of the owner of any vessel, whether American or foreign, for an embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

If a boat owner is allowed protection under the Act, he can obtain an order from the federal district court enjoining all litigation against him as a result of the accident or collision, and he can limit his liability for injuries and damage caused by the accident to the value of his vessel. All claims against him must then be brought in the federal district court.[1]

Petitioner is the owner of the motorvessel Outdoorsmen, a 26′3″ Searay powered by a 260 horsepower Mercruiser engine. On June 8, 1985 at approximately 6:57 p.m., the Outdoorsmen suffered a collision with another vessel, the Seaduction, just west of Holland harbor's north breakwater light. The Seaduction is a 24′4″ Searay 1974 Weekender model powered by two 330 horsepower Mercruiser engines. The Sea-

---

1. One suit in the Kent County Circuit Court was filed by two persons who were passengers on petitioner's boat, on behalf of themselves (for their personal injuries) and on behalf of their minor children for loss of society and companionship. The father alleged that he lost his right arm and has suffered nerve damage to his left arm and hand, injuries to his chest, his right buttock, hip, thigh and knee. The complaint alleges that his wife suffered a fracture of her right jaw, loss of teeth, a fractured sternum, fractured ribs, laceration of her right lung and loss of her right breast. It is apparent to the Court that if such claims were successfully litigated, that the resulting damage award would exceed the proposed limitation fund of $16,000. *See Thomas W. Ouding, et al. v. Grayson Wilson, et al.,* Case No. 85–8811, Kent County Circuit Court.

duction was allegedly operated by her owner at the time of the collision. Petitioner claims that his boat, the Outdoorsmen, was not being operated by himself at the time of the collision, nor did he have privity or knowledge of the events leading up to the collision. Petitioner brought this action in federal court seeking to limit his liability, in accordance with 46 U.S.C. § 183, to the amount or value of his interest in the vessel. He alleges that such interest amounts to $16,000.

This Court held a show cause hearing on February 3, 1986 for the purposes of determining whether William Lowing, the petitioner, would be allowed to prosecute this claim under the Limitation Act. By written notice, the Court indicated to the parties that there is a difference of opinion among the courts as to whether the Limitation Act applies to pleasure craft. There has been no decisive ruling from the Supreme Court on this point, nor has our Sixth Circuit Court of Appeals directly approached this issue. Two district courts in the past two years have ruled that pleasure craft owners could not avail themselves of the Limitation Act. *See Baldassano v. Larsen*, 580 F.Supp. 415 (D.Minn.1984); and *Complaint of Tracey*, 608 F.Supp. 263 (D.Mass.1985). Both of those Courts determined cases which centered on the exact same issue which is before this Court. After discussing the original intent of the 1851 Limitation Act, the judicial interpretation of the Act by which it was extended to apply to pleasure craft, and the soundness of this extension, both the Massachusetts and Minnesota district courts ruled that the protections of the Act do not apply to pleasure craft. This Court has followed a similar analysis and has reached the same conclusion.

### 1. *Original Intent of the 1851 Act*

The Act was originally passed to place our fledgling merchant marine on an even footing with its foreign counterparts. Overseas shippers from Europe had already enjoyed the protection of similar laws for many years. Senator Hamlin of Maine, who introduced the bill, explained that it followed the English model:

> Why not give to those who navigate the ocean as many inducements to do so as England has done? ... That is what this bill seeks to do, and it asks no more.

23 Cong.Globe 331–32, 31st Cong., 2d Sess. (Jan. 25, 1851).

Senator Davis of Massachusetts noted:

> We are carriers side by side with that nation, in competition with them, and we cannot afford very well to give them any great advantage over us...

*Id.* at 714.

Senator Cass from Michigan summarized the debate with this rhetorical question:

> [H]ow are we to continue our commercial interest on a firm foundation unless we put our shipowners on the same footing with those of other countries? Is there a more important matter than one like this, in which the interest of our whole commercial marine is at stake?

*Id.*

In its first encounter with the statute, the Supreme Court followed the "commercial" interpretation of the Act, as intended by Congress. In *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 121–122, 20 L.Ed. 585 (1871), the Court stated:

> The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount. How many enterprises in mining, manufacturing, and internal improvements would be utterly impracticable if capitalists were not encouraged to

invest in them through corporate institutions by which they are exempt from personal liability, or from liability except to a limited extent? The public interests require the investment of capital in shipbuilding, quite as much as in any of these enterprises. And if there exist good reasons for exempting innocent shipowners from liability, beyond the amount of their interest, for loss or damage to goods carried in their vessels, precisely the same reasons exist for exempting them to the same extent from personal liability in cases of collision. *See also, Main v. Williams,* 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 181 (1894). Comment, *Pleasure Boat Owner Tort Liability in Admiralty: An Examination of the Limited Liability Act and a Proposal for Reform,* 50 So.Cal.L.Q. 572–74 (1977). [Hereinafter cited as *Pleasure Boat Owner Tort Liability* ].

 It is apparent that the original intent of Congress was for the Limitation Act to be a piece of protective legislation for the American merchant marine. In fact, in one of the first cases interpreting the Act, a Michigan district court was unwilling to let the owner of a 51' "steam pleasure yacht" invoke the protections of the statute. In *The Mamie,* 5 Fed. 813 (E.D.Mich.1881), *aff'd,* 8 Fed. 367 (C.C.E.D. Mich.1881), the district court refused to extend limitation to a vessel "not engaged in what is ordinarily understood as maritime commerce." 5 Fed. at 819. However, *The Mamie* did not remain the definitive word on the outer reaches of the Limitation Act. For reasons which scholars have found inexplicable,[2] district courts by the 1920s were able to point definitively to precedent supporting the extension of the Limitation Act to pleasure craft.[3]

### 2. *Judicial Extension of the Limitation Act*

In 1886 Congress amended the Act extending its privileges to "all sea-going vessels, and to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges and lighters." [*See* the current version at 46 U.S.C. § 188.] The amendment specifically does not mention pleasure craft or any other type of noncommercial boat. Furthermore, the Act still provided that an owner could limit his liability to his interest in the vessel "and her freight then pending." [*See* the current version at 46 U.S.C. § 183(a) ]. The Court observes that one does not usually think of a pleasure boat, of any type, as having any "pending freight."

There is agreement among scholars that the precise intent of Congress regarding this amendment is obscure. *See*, Stolz, *Pleasure Boating and Admiralty,* 51 Cal. L.Rev. 661, 708 n. 197 (1963). It was observed in *Pleasure Boat Owner Tort Liability* at note 125 that "there is no discussion in the *Congressional Record* concerning the amendment on the date of passage." *See* Cong.Rec. 5923–41 (1886).

A literal reading of the 1886 amendment dictates a holding that it was intended to extend the Limitation Act to vessels used for inland and coastal navigation, but only to *commercial* vessels used in those activities. However, in 1927 the United States District Court for the Southern District of New York in *In Re Foss (The Luvina),* 1927 A.M.C. 327, assumed that Congress had intended by the 1886 amendment to extend the Act to include pleasure craft. [*See also The Muriel,* 25 F.2d 505 (W.D. Wash.1928).] The *Luvina* court relied primarily upon *In Re Eastern Dredging Co.,*

---

**2.** *See* Comment, *Shipowners' Limitation of Liability—New Directions for an Old Doctrine,* 16 Stan.L.Rev. 370, 374 (1964), which proposes that the courts were able to liberally interpret the statute because it was written ambiguously. *See also Pleasure Boat Owner Tort Liability* at 576–577, stating that the misdirection of the statute was caused by either "mistaken reliance on precedent" or a policy of "liberal construction."

**3.** Having been literally raised on the water as a child on Macatawa Bay, and having been a boat owner (sail and power) frequenting the very area involved, I can well remember the decade of the twenties when large steam ships carrying passengers and freight entered from and departed to the city of Chicago. Such commercial travel provided the primary means of travel.

138 Fed. 942 (D.Mass.1905), in which the Massachusetts district court had decided that the owner of "an ordinary mud scow of 110 feet long" was entitled to the protections of the Act. *Eastern Dredging* distinguished the *Mamie* on the basis that it had been decided before the 1886 amendment. *Eastern Dredging* concluded that "all craft which are vessels for the purposes of maritime law are vessels within the intent of the act as it now stands." 138 Fed. at 944. The *Luvina* court picked up on that quote to support the proposition that the Act's protection extended to pleasure boat owners.

Upon close scrutiny, it can be seen that the *Luvina* court's reliance on *Eastern Dredging* was misplaced. In *Eastern Dredging* the court did not hold that the 1886 amendment made limitation available to all vessels regardless of function. Rather, the court merely held that the Act applies to all commercial vessels whether or not they are engaged in *traditional* merchant maritime activities. *See* 138 Fed. at 944–945. Traditional merchant marine activities were thought of as the functions of carrying merchandise or passengers or both. *Id. Eastern Dredging* involved the limitation petition of the owner of a mud scow which was being used in the dredging activities of Boston Harbor when it collided with a ferry boat. The court held that since it was engaged in commercial activity upon navigable waters, it was entitled to the protections of the Limitation Act. There is no indication in the opinion that the court intended to extend the reach of the Act to vessels not engaged in commercial endeavors.

In 1935 Congress adopted an amendment which required that for claims based on loss of life and bodily injury, the vessel owner must make available a minimum limitation fund of $60.00 per ton for payment of such claims if his ship was a "sea-going vessel." [The current version is found at 46 U.S.C. § 183(b) ].[4] In 1936 Congress supplemented the 1935 amendment with what is now 46 U.S.C. § 183(f). In section 183(f) Congress construed the term "sea-going vessel." In pertinent part section 183(f) reads:

> ... the term 'seagoing vessel' shall not include pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels or their tenders, self-propelled lighters, non-descript self-propelled vessels, canal boats, scows, car floats, barges, lighters, or nondescript non-self-propelled vessels, even though the same may be seagoing vessels within the meaning of such term as used in section 188 of this title.

Courts that have accepted extension of the Act often cite to these 1930s amendments for support. *See, e.g.: In Re Klarman*, 295 F.Supp. 1021, 1022 (D.Conn. 1968); *In Re Porter*, 272 F.Supp. 282, 285–286 (S.D.Tex.1967).

■ Because Congress specifically excluded pleasure craft from the gross tonnage amendment [section 183(b)] these courts have held that Congress intended to include pleasure craft in the main portion of the Act, section 183(a). A recent Massachusetts district court decision, *Complaint of Tracey*, 608 F.Supp. 263, 268 (D.Mass. 1985) noted that there was nothing in the congressional history which evidenced such an intent by Congress. The court went further and stated that: "The Courts could have excluded pleasure craft from the entire Act and still remained true to the congressional intent." *Id.* This Court agrees with the Massachusetts court. By its very terms the amending section calls for judicial interpretation. Section 183(f) provides that any of the non-sea-going vessels listed *may* be determined to be sea-going vessels for purposes of the Act. The use of the permissive "may" can be interpreted as allowing judicial discretion in defining the term "vessel" for the core portions of the Act. Accordingly, the judiciary *may* in its discretion decide to include or exclude pleasure craft from the act.

---

4. 46 U.S.C. § 183(b) was amended on October 19, 1984 by Public Law 98–498, Title II, § 213(a), 98 Stat. 2306. The limitation fund is now $420.00 per ton.

It is true that section 183(f) specifically mentions the term "pleasure yacht." But that does not directly imply that Congress intended, or assumed, that pleasure craft came within the purview of the statute. What is being stated in section 183(f) is that for purposes of those parts of the Act regarding gross tonnage as the factor for determining the limitation fund, certain craft will be excluded from any such determination. The idea was that only large ocean-going type of vessels are suited for the gross tonnage determination. Thus, Congress excluded all the enumerated vessels in section 183(f) even though such vessels *may* be considered "sea-going vessels" within the meaning of section 188. Section 188 stated that a sea-going vessel would include vessels that traveled on the inland waterways as well as vessels that went overseas. Section 188 was the outcome of the 1886 amendments.

■ Courts must accord statutory language its common sense meaning unless that statute or its legislative history requires some other reading.

This duty to fairly and equitably interpret legislation is of long standing and was well stated in *Heydon's Case*, 76 Eng.Rep. 637 (Ex. 1584).

* * * [T]he office of all the Judges is always to make such * * * construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief * * * and to add force and life to the cure and remedy, according to the true intent of the makers of the act. * * *

See also *Gray v. United States*, 410 F.2d 1094 (3rd Cir.1969).

Keeping in mind the statutory history of the core portions of the Act, this Court finds it not at all unreasonable to read the Act as still excluding pleasure craft from its protection, notwithstanding the fact that Congress used the term "pleasure yacht" in section 183(f).

### 3. The Propriety of this Court Making a Decision

It was noted in *Complaint of Tracey* that on two occasions the Supreme Court has had an opportunity to discuss the Limitation Act's reach on pleasure craft. *Id.* at 266. *See Coryell v. Phipps (The Seminole)*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941). However, in both cases the High Court never approached the question of whether pleasure boats fell within the statute.

It has been argued that the Supreme Court merely assumed that the Limitation Act applied to pleasure craft since no issue was raised as to the Act's applicability to pleasure craft. *Baldassano v. Larsen*, 580 F.Supp. 415, 417 (D.Minn.1984). It is also hypothesized that the Court may have believed that the vessel at issue was not a pleasure boat at all.[5]

The most likely reason for the Supreme Court's avoidance of the question whether the Act applied to pleasure boats is that in each case before the High Court, the major issue was whether there was privity, or knowledge on behalf of the vessel owner sufficient to defeat his petition for limitation. This Court agrees with the Court in *Complaint of Tracey;* to impute that the Supreme Court totally accepted the application of the Act to pleasure craft, when it never squarely addressed the issue, is not a legitimate reading of the case law. *See* 608 F.Supp. at 266.

Our Sixth Circuit has had one case which, without discussion, assumed that the Limitation Act applied to pleasure boats.[6] In *Feige v. Hurley*, 89 F.2d 575

---

5. In *Complaint of Tracey*, 608 F.Supp. at 267, the Court cited the lower court opinion in *Coryell v. Phipps* which indicated that the "pleasure yacht" at issue was purchased by its owners for use as a charter vessel for hire. *Coryell v. Pilkington*, 39 F.Supp. 142, 143 (S.D.Fla.1941).

6. The court in *Fiege v. Hurley* stated at 89 F.2d 576 that "the statute applies to any vessel." It casually determined that "appellant's objection to the jurisdiction [of the district court] was untenable." However, because the court determined that the case was to be dismissed because of a contributory negligence defense, it stated

(6th Cir.1937), the court held that the statute applies to "any vessel" and cited three cases for support. Of the cases cited in *Feige*, two involved vessels that were clearly involved in commercial activity. *Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), involved a launch used to ferry employees of the limitation claimant. *The Oneida*, 282 F. 238 (2d Cir.1922), involved the Limitation petition of the owner of a launch which was used for towing other vessels. The third case cited in *Feige*, *Warnken v. Moody*, 22 F.2d 960 (5th Cir.1927), does involve the limitation petition of a pleasure boat. However, it should be noted that the Fifth Circuit in *Warnken v. Moody* simply assumed that the vessel fell within the purview of the statute, and did not devote any discussion to this issue. *Id.* at 962.

It is apparent to this Court that the holding in *Feige v. Hurley* extending limitation to pleasure boats is not well grounded. Two of the decisions it is predicated upon involved commercial craft; and these decisions in no fashion mention pleasure boats. The one decision which did involve a pleasure boat, is itself a questionable decision which merely assumed extension of the Act to cover pleasure boats. The *Warnken v. Moody* case is of the type characterized by one commentator as a decision which blindly followed the Supreme Court's policy of "liberal construction" regarding the Limitations Act.[7] Neither the decision in *Warnken v. Moody*, nor the Sixth Circuit's decision in *Feige v. Hurley* contain any rationalization of the legislative history of the Act or its amendments. Furthermore, the cases cited as precedent by those courts contain no discussion as to the intent of Congress. In view of the fact that on its face the statute clearly'does not include pleasure craft within its purview, it would be anticipated that a final decision from the Sixth Circuit on this issue would contain a more detailed discussion as to how pleasure boats fit within the statute.

Because the Supreme Court has not squarely addressed this issue, and because our Circuit has not yet made a detailed pronouncement which can withstand scrutiny, this Court determines that it is competent to decide this question.

Moreover, the question at hand is one of statutory construction and interpretation, and as such is a duty for which the Courts have primary responsibility. *Salehpour v. I.N.S.*, 761 F.2d 1442 (9th Cir. 1985); *Markair Inc. v. C.A.B.*, 744 F.2d 1383 (9th Cir.1984); *Hiatt Grain and Feed Inc. v. Bergland*, 602 F.2d 929 (10th Cir. 1979); *Lubrizol Corp. v. E.P.A.*, 562 F.2d 807 (D.C.Cir.1977). Thus, this Court need not wait for Congress to further elaborate or amend the Act.

### 4. A More Equitable and Correct Reading of the Statute

Those courts in recent years that have accepted the Limitation Act's application to pleasure boats have nonetheless expressed grave misgivings about the inequities of such action. "Contemporary thought" noted the Fifth Circuit Court of Appeals, "finds little reason for private owners of pleasure craft to take advantage of the somewhat drastic—for the injured claimants—provisions of the Limitations Act." *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir.1975). The Fourth Circuit Court of Appeals stated in *Richards v. Blake Builders Supply Inc.*, 528 F.2d 745, 748 (4th Cir.1975):

Surely, the limitation of liability to the value of the boat of an owner without 'privity or knowledge' of the fault in the context of a small pleasure craft capable of causing death or grievous injury is in conflict with our senses of justice and appropriateness. It may have been necessary to provide an owner of a commercial vessel with the right to limit his liability to the after event value of the vessel; American shipping was in compe-

that: "The result reached removes from the case any necessity for a consideration of the question of limited liability under tit. 46 ¶ 183..."

7. *See Pleasure Boat Owner Tort Liability* at 576–577; also see footnote 1 *supra*.

tition with English shipping where there was such a right, and members of the industry may have been thought in need of protection from exposure to all of the economic consequences of major disasters. But we can perceive no reason to extend that protection to the relatively affluent owners of pleasure boats and their insurers at the expense of those injured or killed and their families.

In *Complaint of Brown*, 536 F.Supp. 750 (N.D.Ohio 1982), the court allowed petitioner to pursue his limitation claim, but acknowledged that the case law does "echo the severe criticism leveled by the text writers at the application of the Act, and admiralty jurisdiction, to pleasure boating accidents where no commercial activities are involved." *Id.* at 752.

The prominent treatise on admiralty law, Gilmore and Black *The Law of Admiralty*, 2d Edition 1975, states that:

> The Limitation Act, originally passed to afford a measure of relief to a hard-pressed and highly competitive industry, has become a charter of irresponsibility for a few wealthy individuals. The individual owner of, say, a small fishing vessel which explodes in port may well find himself liable to respond in damages under circumstances where the absentee yacht-owner will go free. No theory can justify the results reached in *Coryell v. Phipps* or *The Trillora* [76 F.Supp. 50 (E.D.S.C.1947)], under which the owner of yacht or speedboat, who is provident enough to hire someone else to run the boat for him, is granted a general license to kill and destroy.

*Id.* at 882.

A primary purpose of tort law is to fairly and adequately compensate the victims of accidents. *See* W. Prosser, *Handbook of the Law of Torts*, § 1, at 6 (4th Ed.1971). Numerous courts have surmised that the application of the Limitation Act to pleasure craft violates this goal. Two recent decisions, have decided that such a violation cannot go unchecked.

In *Complaint of Tracey*, 608 F.Supp. at 268–269, the court noted that when the owner is successful in limiting his liability, a claimant can still proceed against the primary tortfeasor. However, such a tortfeasor may not have sufficient assets to satisfy judgment. Additionally, such tortfeasor would have to be sued in a separate proceeding. The court noted that the net result is to create extra expense for both the injured claimant and the judicial system. In *Baldassano v. Larsen*, 580 F.Supp. at 419, it was observed that many of the original reasons for passing the Act no longer exist:

> Individual and syndicate ownership of vessels has yielded to corporate ownership which, with its own form of limited liability, makes the statute's protection of less importance. Insurance coverage—including hull and cargo and liability insurance—has expanded greatly. It may well be that the greatest beneficiaries under the act today are not, as was intended, ship builders and owners, but rather insurance companies who are able to collect full premiums while limiting their liability to the value of the vessels.

The court in *Complaint of Tracey* noted what the *Baldassano* court had said and remarked that even if the Act's original rationale of encouraging investment still has merit, that reasoning has no sensible application to the pleasure craft situation:

> In contrast to commercial shipping, pleasure boat owners in America operate within an intranational economic market, free of foreign competition. Pleasure craft owners, excluded from the Act, will not find themselves at a competitive disadvantage with respect to the cost of participating in their chosen activity. Thus, there is no rational basis for application of the Act to pleasure boats.

608 F.Supp. at 269.

Like the courts in *Tracey* and *Baldassano*, this Court finds that the historical extension of the Limitation Act to pleasure boats occurred without Congressional approval and allows for unjust and unneces-

sary repercussions.[8] The Court acknowledges that its determination contravenes the majority of the available precedents. Mark Twain provided insight into the Court's duty in such a situation when he said, "Loyalty to petrified opinion never yet broke a chain or freed a human soul." [9]

Following Mark Twain's directive, this Court believes that the most prudent approach to this problem is to address it squarely on its face, as opposed to sitting back, hoping that some other participant in the legal arena will carry the ball.[10] Accordingly, petitioner's complaint is DENIED and this case is dismissed with prejudice.

IT IS SO ORDERED.

---

8. *See Complaint of Tracey*, 608 F.Supp. at 269; and *Baldassano v. Larsen*, 580 F.Supp. at 419. Also see *Pleasure Boat Owner Tort Liability*, 50 S.Cal.L.Rev. 549, 583 (1976–1977).

9. Inscribed beneath Mark Twain's bust in the Hall of Fame for Great Americans at the campus of the Bronx Community College of the City University of New York.

10. Some courts that have addressed this issue have taken the option of granting the limitation petition, but then certifying the case for an immediate interlocutory appeal. *See e.g., Com-*

*plaint of Brown*, 536 F.Supp. 750 (N.D.Ohio 1982). This Court does not see the need to take such great pains to preserve outdated and inexplicable precedent. In *Baldassano v. Larsen*, 580 F.Supp. at 419–420, the court approached this point when it said:

> The Court is not unmindful of the fact that this opinion is precedent-breaking. There will no doubt be a great deal of interest shown in this litigation by many entities standing to profit by the status quo. But this situation cries out for remedial adjudication, and this court cannot ignore the fundamental unfairness of the law as it exists.