Everett SISSON, as subrogor, and American Home Assurance Company, as subrogee of Everett Sisson, Plaintiffs,

v.

HATTERAS YACHTS, INC., and Frigidaire Corporation, Defendants.

No. 87 C 0652.

United States District Court, N.D. Illinois, E.D.

Oct. 29, 1991.

Dennis Minichello, Warren J. Marwedel, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs.

R. Bruce Duffield, Lord, Bissell & Brook, Douglas Palandech, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

### I.

### HISTORY OF THE CASE

This case is before the court after a bench trial for entry of findings of fact, conclusions of law and disposition of certain pending motions. Admiralty jurisdiction is invoked pursuant to 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h).

In January 1985, plaintiff Everett Sisson ("Sisson") purchased the M/V ULTORIAN (the "Ultorian"), manufactured by defendant Hatteras Yachts, Inc. ("Hatteras"). On board was a washer/dryer unit manufactured by Frigidaire, a division of defendant White Consolidated Industries, a corporation ("Frigidaire"). On September 23, 1985, a fire in the dryer unit resulted in the destruction and sinking of the Ultorian. Sisson's insurance company, plaintiff American Home Assurance Company ("American Home") paid for the loss of the Ultorian and damage to adjacent vessels and docking. American Home presses this action as a subrogee of Sisson and an assignee of the rights of fire claimants against him.

Prior to the institution of this action, Sisson filed a related action in this court (86 C 1991) for limitation of liability to the amount of the salvage value of the Ultorian ($800) pursuant to 46 U.S.C. § 183, *et seq.* In that action, it was ruled (Bua, J.) that admiralty jurisdiction did not exist with respect to the destruction of a docked pleasure vessel. *Matter of Sisson,* 663 F.Supp. 858 (N.D.Ill.1987). Alternatively, it was held that if subject matter jurisdiction existed, the limitation of liability act did not apply to a pleasure craft. *Matter of Sisson,* 668 F.Supp. 1196 (N.D.Ill.1987). On appeal the Seventh Circuit affirmed the dismissal for want of admiralty jurisdiction. *Complaint of Sisson,* 867 F.2d 341 (7th Cir.1989). Thereafter, the Supreme Court reversed the judgment of the Seventh Circuit. *Sisson v. Ruby,* — U.S. —, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Neither the Supreme Court nor the Seventh Circuit passed on the alternative grounds stated for dismissal of Sisson's action. Accordingly, American Home properly settled the claims against Sisson and obtained valid assignments of the claimants' actions against defendants.

Because of the existence of factual issues as to the cause and origin of the yacht fire and possible product liability on the part of defendants, summary judgment was denied in this case by an opinion and order dated September 11, 1989. *Sisson v. Hatteras Yachts, Inc.,* No. 87 C 0652, 1989 WL 106584 (N.D.Ill. Sept. 14, 1989).

Based on *East River Steamship Corp. v. Transamerica Deleval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), which bars recovery in tort in admiralty proceedings for economic losses when a commercial party claims injury to a product, it was ruled on March 27, 1991 that plaintiffs were precluded from recovery in tort from defendants for the loss of the Ultorian but not for damage to other property consisting of vessels and docks. *Sisson,* 1991 WL 47543. Plaintiffs' claims for contribution were reinstated. *Id.* Thereafter, American Home sought to amend the pleadings to state direct actions as assignee against defendants. Defendants opposed the late amendment and the motions were contin-

ued for consideration at the trial with leave given to American Home to prove the claims which it did. Based on the facts herein stated, American Home was and is entitled to press the assigned claims against defendants.

American Home contends that the fire on the Ultorian and damage to adjacent vessels and property resulted from one of several product defects and that it was not due to any conduct of the Sissons in the operation of the dryer. Defendants contend that the fire resulted from spontaneous combustion of oily rags placed in the dryer by the Sissons and not from any product defect. The parties agree that if the fire was caused by something other than a product defect, defendants are not liable.

## II.

## FINDINGS OF FACT

Based upon the Uncontested Facts stated in the final pretrial order (which are adopted as findings of fact), the testimony, exhibits and depositions received in evidence, the court finds the facts to be as follows:

### A.

### Uncontested Facts

1. American Home is an insurance company doing business in the State of Illinois and is subrogated to all of the rights of its insured, Everett Sisson, by virtue of having paid a claim made by Everett Sisson for the loss of his yacht, the Ultorian, under a policy of insurance issued to him. American Home is also the assignee of all of the rights of the claims pursuant to settlement agreements with those assignees.

2. Sisson is a citizen of the State of Illinois.

3. Defendant Hatteras is a division of Genmar Industries, Inc., a Delaware corporation with its principal place of business in Minnesota. Hatteras has been designing and building boats at its plants in High Point and New Bern, North Carolina for many years and finished construction of the subject [37 ton] 56–foot motor yacht in 1981. The boat was sold by Hatteras to Dry Land Marina, Inc., a marine dealer in Grand Haven, Michigan.

4. Defendant Frigidaire is an operating division of White Consolidated Industries. The manufacturing of the Frigidaire product line is conducted in Webster City, Iowa. White Consolidated Industries is incorporated in Ohio and has its principal place of business in Ohio.

5. Frigidaire built and sold the washer/dryer product line Model LC 240 H.

6. The original purchaser of the subject boat was Robert Fryling of Grand Rapids, Michigan, who sold the boat to Grand Isle Marina in 1984. Sisson purchased the boat in early 1985 for his personal use and named it the Ultorian.

7. The subject boat was equipped when first built by Hatteras with a Model LC 240 H washer/dryer manufactured by Frigidaire.

8. On September 23, 1985, Sisson's wife, Betty, used the LC 240 H to wash and dry some towels which had been used to wipe unabsorbed Watco Teak Oil from wood surfaces in and on the boat.

9. Late in the evening of September 23rd, 1985, or in the early hours of the 24th, a fire broke out on board causing extensive fire damage as a result of which the boat capsized, rendering it a total loss.

10. Frigidaire sold the model LC 240 H unit laundry centers to Hatteras and knew that those units would be installed on boats manufactured by Hatteras.

11. The washer/dryer unit on board the Ultorian on the night of the occurrence was the same unit installed by Hatteras at the time the yacht was constructed.

12. The washer/dryer unit Model LC 240 H on board the Ultorian on the night of the occurrence had not been altered, modified or repaired in any way by the Sissons or the original owner of the Ultorian.

13. The manner in which the washer/dryer unit had been installed in the boat and vented to the outside of the boat had not been altered between the time the boat

left the Hatteras factory and the day of the fire.

14. The Ultorian was a total loss and Sisson was paid $600,000 by American Home pursuant to his policy of insurance.

## B.

### Facts Determined at Trial

Additional facts are found to be as follows:

15. American Home is the assignee of all of the rights of the claimants John P. Walther; Continental Insurance Company as subrogee of John P. Walther; Cincinnati Insurance Company as subrogee of John P. Walther; Fireman's Fund Insurance Company as subrogee of Burton Ruby; the Port Authority of Michigan City; Moac/Continental Insurance Company as subrogee of Roger Dillon; and Moac/National Ben Franklin Insurance Company as subrogee of Joseph T. Charles, pursuant to settlement agreements with those claimants. The total amount of the claims assigned to American Home is $279,792.56. The total amount of settlements paid by American was $174,516.92.

16. Defendants were given notice of the claims of the claimants against Sisson and of America Home's intent to seek recovery of amounts paid to the claimants when American Home filed its original complaint in this action (Count IX). Defendants were tendered the defense of the claims in accordance with Fed.R.Civ.P. 14(c). Defendants did not accept the defense. Defendants were also advised of the settlements made with the claimants and tendered the opportunity to pay the settlements but refused. Moreover, there was no prejudice to defendants by the presentation of the claims in this action. All parties were fully informed, discovery was extensive and all factual issues were fully developed.

17. The towels placed in the LC 240 H washer/dryer on September 23, 1985 had been used by Sisson and his wife to wipe unabsorbed Watco Teak Oil from approximately 365 square feet of teak wood paneling in the Ultorian's pilothouse. Oil was applied to the wood with other towels and rags which were discarded after use. Subsequently, the soiled towels were placed in the washer with other rags and washed with detergent and bleach before being placed in the dryer. The Sissons used three or four towels for wiping the trim. The rags and other material resulted in a one-half wash and dry load consisting of some 12 rags.

18. The rags and towels were placed in the dryer at approximately 9:00 p.m. The drying cycle lasted about 45 minutes. A buzzer sound was heard signaling the completion of the drying cycle and shut-off of the dryer. The rags and towels were left in the dryer. Around midnight of September 23–24, 1985, the Sissons smelled smoke and investigated. The Sissons saw smoke coming from the area where the LC 240 H was enclosed in a wood cabinet. Mr. Sisson smelled a very acrid odor and saw "starlike emissions" of fire from behind the dryer. He also saw smoke coming from the area along the right hand side of the dryer. Mrs. Sisson described the smoke as "gray not black." Mr. Sisson discharged a fire extinguisher into the area from which smoke was emerging.

19. The Sissons left the boat to call the fire department. When they returned they saw flames in the pilothouse.

20. Adolf Wolf, a registered professional engineer, associated with Packer Engineering, was called by plaintiffs as an expert witness to testify as to the cause and origin of the fire. He testified that the origin of the fire was in the lower right rear area of the dryer cabinet where the exhaust ducts lead out of the dryer. Mr. Wolf testified that the ignition of lint, a flammable material, resulted from one of five sources: (1) a failure of the belt that rotates the dryer drum which could lead to overheating of lint; (2) interference of the operation of thermal limit switches by lint; (3) reduced airflow in the vent because of the design and installation of the exhaust vent; (4) damage to the time control device; or (5) lint contacting the heating coil, igniting and contacting and igniting other lint in the bottom of the cabinet. Mr. Wolf stated that lint contacting the heating coil could

have ignited and found its way into the bottom of the dryer cabinet by working its way past the drum seal or through the lint duct, bypassing the filter, and igniting other lint in the bottom of the cabinet which would be a possible cause of the fire.

21. Mr. Wolf also expressed the opinion that the design of the dryer was defective because: (1) it did not have a removal lint screen inserted on the back panel of the dryer to filter lint from the air entering the heater box of the dryer; (2) the lint screen in the front of the dryer did not adequately filter lint before it was drawn into the exhaust because it was not installed in a fashion to eliminate the escape of lint; and (3) the joints around the motor and blower housing were not sufficiently tight to prevent the escape of lint.

22. Mr. Wolf also found that the installation of the LC 240 H unit was defective because: (1) there were too many bends in the flexible vent house to allow proper exhaust of hot air from the dryer; (2) the vent duct did not have a flapper to prevent the inflow of air; (3) neither the installation nor the unit were tested for marine application; (4) the installation made access to the rear of the dryer extremely difficult; and (5) neither Hatteras nor Frigidaire advised consumers of the likely build up of lint in the dryer cabinet and the necessity to clean lint out of the dryer cabinet.

23. In August 1985, Mr. Sisson cleaned the exhaust system of the dryer with a hose powered by compressed air. The hose was placed at the lint screen. Lint was exhausted out of the exterior vent hosing to the outlet at the starboard hull. Mrs. Sisson cleaned the lint screen each time the dryer was used.

24. On the day of the fire, September 23, 1985, the Sissons had oiled wood surfaces in the yacht pilothouse using a product known as Watco Teak Oil. Watco Teak Oil contains 30% linseed oil which, because of its molecular structure, is capable of spontaneous combustion under certain conditions. The oil can contains warnings and precautions for disposal of application rags and warns of the risk of spontaneous combustion.

25. The marine standards of the United States Coast Guard require that rags soaked with oil or gasoline be kept in a tightly closed metal container and disposed of accordingly. The National Fire Protection Association has promulgated standards for pleasure and commercial motor craft, which provide that waste and rags coated with oil, paint, paint remover, or polish should be stowed in metal containers or in metal lined lockers and immediately disposed of ashore and not stored aboard.

26. Determination of the cause of a fire is a process of elimination. The washer/dryer where the fire originated was retrieved by Packer Engineering from the Ultorian after the fire, and was examined to determine the cause of the fire. There is no evidence to indicate that the fire was caused by any electrical short or malfunction. The area exhibiting the most intense burning in the washer/dryer was found inside the drum of the dryer. The rags inside the drum of the dryer were completely burned by the fire, leaving only traces of cotton ash.

27. Cotton is a flammable cellulosic material consisting of many small cells. Linseed oil can be absorbed into the cells of cotton and retained. The washing of cotton with detergent, bleach and water may not eliminate all linseed oil from cotton fabric. Water and bleach will not remove oil. Only detergent will remove oil. Household bleach is an oxidant. Solid bleach residue can remain on cotton goods after a washing and drying cycle eliminates the liquid bleach product.

28. Spontaneous combustion is the oxidation of (a) a combustible material (such as linseed oil) resulting in an exothermic (heat liberating) reaction (b) produced by sufficient air or air and an oxidant (such as bleach residue) to allow for oxidation when (c) sufficient insulation (such as cotton rags) prevents the heat being generated by the reaction from dissipating. Application of external heat accelerates spontaneous combustion. For every 10 degrees centigrade of temperature increase, the speed of the reaction doubles. Raising the temperature of cotton materials from air tempera-

ture of 70° F in a dryer to 130° F doubles the speed of the reaction three times, meaning the reaction takes place at a rate multiplied by a factor of eight. Cotton will ignite at a temperature range of 300° F–400° F. Burning cotton gives off whitish-grayish smoke.

29. The fact that the fire occurred on an occasion when flammable cellulosic rags capable of absorbing oil and constituting insulating material were used to wipe a product consisting of 30% linseed oil and then the rags were retained in an environment of air and an oxidant for two hours after being heated for 45 minutes to 130° F is persuasive circumstantial evidence that the fire was caused by spontaneous combustion and ignition of the rags.[1]

30. Dr. Max Adams, associated with Packer Engineering, was called by plaintiffs to testify concerning tests conducted under his direction to show that spontaneous combustion did not occur. The results of Adams' tests are not convincing. Significant test variables existed. (a) Adams used fewer rags than were dried on the night of the fire. The additional rags are significant because they provide insulation around the oily rags, retaining any heat generated by the chemical reaction in the oily rags.[2] (b) In five of the six tests, the dryer door was opened, allowing heat to escape. The rags were removed from the heated dryer and were placed in a chest at ambient temperature. In contrast, on the night of the fire the rags were left in the heated environment of the dryer drum, with no exposure to ambient temperature. Exposure to cool air will retard or prevent a spontaneous combustion reaction. (c) In the two tests, which yielded the highest temperatures, the dryer time was only 20 minutes. (d) In four of the tests, Watco oil was applied to rags by wiping oil from a five square foot piece of wood that had never been oiled before. In contrast, 365 square feet of previously oiled teak surface were involved in this case.

31. The preponderance of the evidence establishes that the cause of the fire was spontaneous combustion and ignition of the cotton rags that had been used to wipe the Watco Teak Oil from the wood trim of the Ultorian.

32. There is no direct evidence that the dryer belt failed and caused the fire, or that the control thermostat or the high temperature limit switch simultaneously failed and caused the fire, or that the exhaust vent house was clogged and caused the fire, or that the timer control failed and caused the fire, or that a piece of lint was actually ignited by the heater coils and ignited the fire in the bottom of the dryer cabinet.

33. The uncontested evidence established that the fire occurred at least two hours after Mrs. Sisson heard the signal that the dryer was off. This is evidence that the dryer controls were working and that the coil was shut off preventing ignition of lint by the coil.

34. An important issue in this case is whether the temperature control and thermal limit switches in the dryer were working before and after the fire. In a deposition before trial given by plaintiff's expert, Thomas Leahy of Packer Engineering, he testified as follows:

Q. Was this dryer equipped with any system which would inhibit its overheating?

A. Yes.

Q. What was that system.

A. There is the normal temperature control device, and there is also a metal switch called a limiter that is plotted right at the element plat itself, so that if it reaches a certain temperature it would shut it off.

Q. So there are actually two systems which would serve to limit the build-up of heat in the dryer?

A. That's correct.

1. One of defendants' experts on the cause and origin of the fire also relied on a test report finding that traces of a substance having the characteristics of Watco Oil were found in fire debris removed from the destroyed dryer unit.

2. Adams' change of his testimony at trial from his deposition on the important subject of how many rags were used in the drying cycle of his test damaged his credibility.

Q. The first of those is the control thermostat?

A. Yes.

Q. Which shut the heating coils on and off within a range of temperature measured inside the dryer?

A. That is correct.

Q. And the second entirely independent system is the limiter thermostat?

A. Right.

Q. Such that if the dryer reaches a certain temperature, the heating elements will be shut down?

A. That's correct.

Q. Do you have any evidence to suggest that either or both of these systems was not functioning prior to this fire?

A. We tested them and we found them working. (Tr. 209–10).

However, on the fifth day of trial, after much evidence was given based on the working operation of the temperature limit switches, Leahy and another Packer Engineering technician were called by plaintiffs as "rebuttal" witnesses to testify that the switches were not tested. Leahy testified that he did not know how he said otherwise at his deposition.

The Leahy transcript pages quoted were cited by defendants on page 33 of the final pretrial order as transcript to be relied upon at trial. Defendants' proposed finding of fact 73 (a part of the final pretrial order), also requests that the court find that the temperature controls were in working order based on this testimony. There is, therefore, no basis upon which it can be concluded that facts relating to the operation of the temperature limit switches were simply overlooked. Such a change in, or disavowal of, sworn deposition testimony by an expert witness is not acceptable and destroys credibility. The importance of the claimed error is obvious and should have been disclosed by a timely correction to the witness's deposition. *See* Fed. R.Civ.P. 26(e)(2). Defendants were entitled to rely on the witness's statement as evidence that the temperature control and thermal limit switches were in working order. Packer Engineering examined and maintained possession of the dryer and

switches and only permitted defendants to examine the dryer in the company "parking lot."

Moreover, on cross-examination at trial, the Packer witnesses testified that the thermal limit switch did not appear to be pitted, welded or otherwise give any indication of failure. Based on all the evidence, it is found that the temperature control and thermal limit switches were in operation before and during the fire.

35. A belt failure did not cause the fire because the high temperature limit switch would turn off the heater coils at temperatures above 135° F.

36. Lint fouling or insulating the control thermostat and the high temperature limit switch did not cause the fire, because such insulation would only allow the dryer temperature to increase to 145° F to 150° F, which is 150° F lower than the lowest possible ignition point of lint. Both the control thermostat and the high temperature limit switch were working.

37. Obstruction of the exhaust hose did not cause the fire, because the high temperature limit switch would turn off the heater coils at temperatures above 135° F (or at 150° F if the switches were malfunctioning). Such temperatures were 150° F lower than the lowest possible ignition temperature of lint. Also, Mr. Sisson blew out any lint from the exhaust tubing with an air hose three weeks prior to the fire, and Mrs. Sisson was careful to clean the lint trap after each use.

38. Malfunction of the timer control did not cause the fire because the high temperature limit switch would turn off the heater coils at temperatures above 135° F (or at 150° F). Such temperatures are 150° F lower than the lowest possible ignition temperature for lint. Also, the dryer coil was off at least two hours before the fire.

39. Ignition of a piece of lint on the heater coils which then traveled through the dryer igniting more lint in the lower dryer cabinet did not cause the fire because there is no pathway for such an ember to move from the heater coils into the lower area of the dryer. The movement of such

a burning particle of lint would be blocked by the tumbling dryer drum containing half a load of rags, the lint screen, and the drum seal. Even if such a particle could be ignited by the heater coil and somehow pass through still ignited, the fire did not occur until more than two hours after the heater coil was turned off. Also, lint does not have an ember quality. If ignited it burns quickly to ash.

40. A rearward opening cowl (instead of a "flapper") to cover a dryer exhaust vent is appropriate in a marine application, because the presence of salt water could cause a "flapper" to become stuck shut from corrosion or contamination from water and debris. The routing of the exhaust vent tubing (which loops several inches above the vent opening in the hull before traveling downward to the dryer exhaust terminus) is an appropriate and effective design used in conjunction with the vent cowl in keeping water and debris out of the dryer.

41. Frigidaire has sold 44,632 identical LC 240 H washer/dryer units, and there has never been a fire resulting from a defect in that product line. Hatteras has designed and built in excess of 2,000 yachts incorporating stacked unit washer/dryer units installed and vented in the same or very similar fashion as the washer/dryer unit on the Ultorian, and Hatteras has never received notice of any claim that a defect in the installation or venting of any of those units caused a fire.

42. From the time of the purchase of the Ultorian to the date of the fire, neither Sisson nor his wife, Betty, experienced any operational problems with the washer/dryer.

43. The sole proximate cause of the fire was due to spontaneous combustion and ignition of oil contaminated rags placed in the dryer unit of the vessel by the Sissons and was not due to any product defect or failure to warn on the part of defendants.

## III.

## CONCLUSIONS OF LAW

■ 1. The claim of American Home against the defendants is premised on the law of products liability. Maritime law has adopted the concepts of strict liability based both on tort and on Section 402A of the Restatement of Torts (2nd) Strict Liability. *East River Steamship Corp. v. Transamerica Deleval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.,* 565 F.2d 1129 (9th Cir.1977).

■ 2. One who sells a product in a defective condition unreasonably dangerous at the time it is sold to the consumer or his property is subject to liability for physical harm. A product may be defective if the seller fails to give reasonable warnings of danger or a defect in the product known at the time of manufacture or discovered afterwards when the seller by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer. *Nicor Supply Ships Assocs. v. General Motors Corp.,* 876 F.2d 501 (5th Cir.1989).

■ 3. The existence of a defect may be proved through inferential proof when an expert testifies that some type of defect was the cause of the loss and no other cause was likely. *Fernandez v. Chios Shipping Co., Ltd.,* 542 F.2d 145, 154 (2d Cir.1976); *Lindsay v. McDonald Douglas Aircraft Corp.,* 460 F.2d 631 (8th Cir.1972) (proof of specific defect not required); *North American Aviation v. Hughes,* 247 F.2d 517 (9th Cir.1957).

■ 4. The preponderance of the evidence indicates that the acts of placing contaminated rags containing Watco Teak Oil into the dryer, raising the temperature by drying the rags, and leaving them within the dryer compartment allowed spontaneous combustion to occur, which was the sole proximate cause of the fire.

5. The preponderance of the evidence indicates that both the Frigidaire washer/dryer and the Hatteras yacht were properly designed and constructed.

6. Plaintiffs are not entitled to recover any claimed damages from defendants Hatteras Yachts, Inc. or White Consolidated Industries.

IT IS THEREFORE ORDERED that the Clerk of the Court enter a judgment on the merits in favor of the defendants and against the plaintiffs dismissing this case with prejudice and with costs allowed to the defendants.